Glenn T. FREEMAN and Lucy E. Freeman, individually and d/b/a Belvidere East KOA Kampground, Appellants,

v.

Richard W. BLAIR, individually and in his capacity as Secretary of Health, State of South Dakota; Douglas E. Kludt, individually and in his capacity as Assistant Attorney General, State of South Dakota; Michael J. Baker, individually and in his capacity as Assistant Program Director, Department of Health, State of South Dakota; John Does "A" through "K" whose true names are not known, but are believed to be officers, agents or employees of the State of South Dakota, Appellees.

No. 85–5169.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 11, 1986.

Decided June 4, 1986.

Glenn T. Freeman, Midland, S.D., for appellants.

Mark A. Moreno, Sp. Asst. Atty. Gen., Pierre, S.D., for appellees.

Before HEANEY and BOWMAN, Circuit Judges, and TIMBERS,* Senior Circuit Judge.

BOWMAN, Circuit Judge.

Plaintiffs-appellants Glenn and Lucy Freeman filed this section 1983 action against various officials of the state of South Dakota in their official and individual capacities. The Freemans allege that the license to operate their campground was summarily suspended when they refused to submit to an administrative inspection of the premises without a warrant. The Freemans claim that their rights under the Fourth and Fourteenth Amendments were violated. The District Court granted defendants' motion for summary judgment, concluding that the defendants were entitled to absolute or qualified immunity from suit for their actions. We reverse.

## I.

The Freemans own a small farm in Jackson County, South Dakota and, since 1965, have operated the Belvidere East K.O.A. Kampground (the campground). On July 27, 1982, Michael Baker, Assistant Program Director for the South Dakota Department of Health (the Department of Health or the Department), and another Department employee arrived at the campground and requested permission to conduct an inspection, citing two sections of the South Dakota Codified Laws as their authority to do so without a search warrant. The Freemans refused to allow the inspection without a warrant, believing that there was insufficient statutory authority for at least part of the proposed search and that the inspection would not be conducted fairly. The Department officials departed without incident.

The following day, Baker wrote a memorandum to Richard Blair, the Secretary of the Department, recommending suspension of the Freemans' campground license unless Blair thought that a search warrant was necessary. Blair contacted the state attorney general's office for advice. Attorney General Mark Meierhenry and Assistant Attorney General Douglas Kludt reviewed the South Dakota statutes and Kludt subsequently met with Blair and advised him that no warrant was necessary to inspect the Freemans' property. Blair then called the Freemans and arranged an appointment for the following morning although the Freemans indicated that they still would require a search warrant.

On the morning of July 30, 1982, Blair, Baker, and Kludt arrived at the campground and requested permission to conduct an inspection. When the Freemans refused to allow the inspection unless the officials had a warrant, Blair served an order on the Freemans summarily suspending their campground license.[1] On the advice of their attorney that the license suspension was improper, the Freemans continued to operate the campground. Amended license suspension orders were served on the Freemans over the course of the next several days, setting a hearing date of August 9. On August 6, Glenn Freeman called Kludt to complain about the short amount of time before the scheduled hearing. During the conversation, Kludt made some reference to possible criminal prosecution for the Freemans' failure to submit to an inspection and for continuing to operate despite the license suspension. Kludt evidently was willing to reschedule the hearing if the Freemans would cease operation. Because of these and other considerations, the Freemans

---

* The HONORABLE WILLIAM H. TIMBERS, Senior United States Circuit Judge for the United States Court of Appeals, Second Circuit, sitting by designation.

**1.** Section 34–18–27 of the South Dakota Codified Laws provides the secretary of health authority to summarily suspend a license upon determining the existence of a hazardous condition. *See infra* at 176. Blair admitted that he knew of no statutory or regulatory violations at the Freemans' campground that would constitute such a hazard.

consented to an inspection. *See* Kludt Deposition, exhibit 4 (transcript of telephone conversation).

In March 1983, the Freemans filed this suit alleging, *inter alia,* that their rights under the Fourth and Fourteenth Amendments had been violated by state officials.[2] The Freemans named as defendants the State of South Dakota, the South Dakota Department of Health, Governor William Janklow, Meierhenry, Blair, Kludt, and Baker. The State of South Dakota and the Department of Health voluntarily were dismissed as parties and the District Court dismissed Janklow and Meierhenry upon defendants' motion.[3] The remaining defendants moved for summary judgment, contending that no search warrant was required prior to inspection and that the summary suspension of the campground license was proper. The District Court held that summary judgment was inappropriate because "plaintiffs were well within their Fourth Amendment rights" to require a search warrant and that the due process claim arising from the summary suspension of the Freemans' license therefore survived. *Freeman v. Blair,* No. 83–3026, slip op. at 6–7 (D.S.D. Oct. 31, 1984).

On August 29, 1984, two days before defendants moved for summary judgment, two employees of the Department appeared at the Freemans' campground desiring to conduct another inspection. The previous scenario replayed itself with the Freemans requesting a search warrant and the new Secretary of the Department of Health, Lawrence Massa, summarily suspending the Freemans' license on the ground that the "public health, safety and welfare im-

peratively required immediate action." Third Amended Complaint, Exhibit G.[4]

On March 22, 1985, defendants again moved for summary judgment, claiming absolute and/or qualified immunity. The District Court granted defendants' motion and dismissed the Freemans' complaint with prejudice. The court held that Blair and Massa were entitled to absolute immunity under *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), because their decisions to initiate administrative proceedings were "analogous" to a prosecutor's decision to commence prosecution. *Freeman v. Blair,* No. 83–3026, slip op. at 7–8 (D.S.D. April 25, 1985). The court also concluded that the remaining defendants were entitled to qualified immunity. *Id.* at 5–6. Reviewing the precedents concerning warrantless administrative searches, the court found that "it was [not] unreasonable for defendants, in 1982 and September, 1984, to assume that they were entitled to inspect [the Freemans'] campground without a search warrant.... It follows from this that defendants are also entitled to qualified immunity" as to the license suspension claims. *Id.* at 5. The court observed that the Freemans were offered a hearing within several days of the suspension and indicated that this comported with the requirements of due process. *Id.* at 6.

## II.

The Freemans urge reversal on the basis that defendants Blair and Massa are not entitled to absolute or qualified immunity nor are any of the remaining defendants entitled to qualified immunity. In reviewing a district court's entry of summary judgment, this Court employs the same

---

**2.** Violation of parallel provisions of the South Dakota state constitution also were pled. Although these claims fall within the ancillary jurisdiction of the federal courts, we will not discuss them here as no authority under state law has been presented to this Court and questions concerning interpretation of state law are best left to the district courts in the first instance.

**3.** The District Court subsequently reinstated Meierhenry as a party.

**4.** Section 1–26–29 of the South Dakota Codified Laws requires a finding to this effect before a license may be summarily suspended. *See infra* note 10, at 176. After the 1984 suspension order was issued, the Freemans requested an administrative hearing concerning the inspection and license suspension, which was held on October 3, 1984. The hearing examiner concluded, as had the District Court, that the South Dakota statutory scheme was insufficient to support warrantless inspections.

standard that a district court utilizes to test the motion initially. Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). All evidence must be viewed in the light most favorable to the non-moving party, giving that party the benefit of all reasonable inferences derived from the evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970). Summary judgment is particularly ill-suited to resolve questions in which "intent, good faith and other subjective feelings play dominant roles." *In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions*, 538 F.2d 180, 185 (8th Cir.1976) (citation omitted), *cert. denied*, 429 U.S. 1040, 97 S.Ct. 738, 50 L.Ed.2d 751 (1977). With this standard in mind, we look to the legal framework governing absolute and qualified immunity.

### A.

■ We begin with the proposition that "qualified immunity represents the norm" for officials of the executive branch of government. *Harlow v. Fitzgerald*, 457 U.S. 800, 807, 102 S.Ct. 2727, 2732, 73 L.Ed.2d 396 (1982). This is so whether the suit is one against federal officials, as in *Harlow*, or one against state officials. *Id.* at 818 n. 30, 102 S.Ct. at 2738 n. 30; *Butz v. Economou*, 438 U.S. 478, 504, 98 S.Ct. 2894, 2909, 57 L.Ed.2d 895 (1978). The Supreme Court in *Butz* stated that "officials who seek absolute exemption from personal liability for unconstitutional conduct must bear the burden of showing that public policy requires an exemption of that scope" because of some "special function[ ]" that the officials serve. 438 U.S. at 506, 508, 98 S.Ct. at 2911, 2912.

■ Among the "special functions" that create absolute immunity, the Court in *Butz* included "agency officials performing certain functions analogous to those of a prosecutor." *Id.* at 515, 98 S.Ct. at 2915. Justice White, writing for the majority, explained that executive branch officials need absolute immunity in this situation because "[t]he decision to initiate administrative proceedings against an individual or corporation is very much like the prosecutor's decision to initiate or move forward with a criminal prosecution" and that the discretion of the responsible officials "might be distorted" in the absence of complete immunity. *Id.* Defendants Blair and Massa argue that they are entitled to absolute immunity under this rationale for their decisions to suspend the Freemans' license since the license suspension was the first step of an administrative proceeding. We disagree.

■ Although there is a facial similarity between the factual setting here and the one in *Butz*, we believe that Blair's and Massa's actions prior to the institution of administrative proceedings distinguish this case from *Butz*. Before any administrative proceedings of the type contemplated in *Butz* occurred, the Department, with the explicit approval of Blair in 1982 and Massa in 1984, decided to conduct an inspection of the Freemans' campground. This is not the type of action that the Court in *Butz* contemplated as generating prosecutorial-type immunity. That type of immunity was reserved for instances in which the proceedings have "the characteristics of the judicial process," *id.* at 512, 98 S.Ct. at 2913, a conclusion not easily arrived at in regard to a decision to inspect. Instead, we view the decisions to inspect, and more particularly to inspect without a warrant, as ones that were not attended by any of the characteristics normally associated with the judicial process. These decisions are analogous to the kind of administrative or investigative functions for which courts ordinarily do not extend absolute immunity to prosecutors rather than analogous to the kind of function for which a prosecutor would be absolutely immune. *See, e.g., Gray v. Bell*, 712 F.2d 490, 498–99 & n.19 (D.C. Cir.1983), *cert. denied*, 465 U.S. 1100, 104 S.Ct. 1593, 80 L.Ed.2d 125 (1984); *Ste-*

*panian v. Addis,* 699 F.2d 1046, 1048 (11th Cir.1983); *Mancini v. Lester,* 630 F.2d 990, 992–94 (3d Cir.1980); *Marrero v. City of Hialeah,* 625 F.2d 499, 506–10 (5th Cir. 1980), *cert. denied,* 450 U.S. 913, 101 S.Ct. 1353, 67 L.Ed.2d 337 (1981); *Daniels v. Kieser,* 586 F.2d 64, 67–68 (7th Cir.1978), *cert. denied,* 441 U.S. 931, 99 S.Ct. 2050, 60 L.Ed.2d 659 (1979); *see also Harlow,* 457 U.S. at 811 n. 16, 102 S.Ct. at 2734 n. 16.[5]

This conclusion, however, does not end our inquiry. The question remains whether Blair and Massa should be absolutely immune for their decisions to suspend the Freemans' license, notwithstanding that they are not entitled to complete immunity for decisions to inspect without a warrant. Although we normally would view the license suspension as the initiation of administrative proceedings entitling Blair and Massa to absolute immunity, we believe that other considerations counsel that absolute immunity is not warranted in these circumstances.

■ In *Nixon v. Fitzgerald,* the Supreme Court instructed that "[i]n defining the scope of an official's absolute privilege," courts must recognize "that the sphere of protected action must be related closely to the immunity's justifying purposes." 457 U.S. 731, 755, 102 S.Ct 2690, 2704, 73 L.Ed.2d 349 (1982). The purposes of prosecutorial immunity, to which an analogy is made here, are found in the desire to insure that the prosecutor may exercise his office with the vigor required to assure the public good and in the desire to prevent the injustice of subjecting to liability public officials who must exercise some discretion because of the legal obligations of their positions. *See Imbler v. Pachtman,* 424 U.S. 409, 422–27, 96 S.Ct. 984, 991–93, 47 L.Ed.2d 128 (1976); *Scheuer v. Rhodes,* 416 U.S. 232, 240, 94

S.Ct. 1683, 1688, 40 L.Ed.2d 90 (1974). In particular, the immunity is intended to forestall the "serious danger that [a] decision to authorize proceedings will provoke a retaliatory response." *Butz,* 438 U.S. at 515, 98 S.Ct. at 2915; *see generally Gray v. Bell,* 712 F.2d at 497–502.

■ We do not perceive these dangers here and see no reason to extend absolute immunity in the instant circumstances. The decisions to inspect without a warrant clearly were functions for which Blair and Massa are not entitled to absolute immunity nor, as we conclude below, were the decisions reasonable under clearly established law. Yet it is precisely these decisions which generated all of the remaining actions for which absolute immunity now is claimed. We are unable to discern how extending absolute immunity to situations such as this one would promote the underlying purposes of the immunity. *See Nixon,* 457 U.S. at 755, 102 S.Ct. at 2704. It is unclear to us how the absence of absolute immunity here would impede an executive branch official's vigorous exercise of his office for proper purposes in the future or how it would be unfair to subject to liability an official who knew or should have known that his initial actions, from which the administrative proceedings flowed, were clearly improper. Therein lies the distinction between this case and *Butz.* In *Butz,* the defendants' actions were proper on their face but may have been taken for impermissible reasons; in the instant case, the initial actions taken by defendants were improper and therefore cannot justify the remainder of their actions. Moreover, as the Court noted in *Butz:*

> It makes little sense to hold that a Government agent is liable for [his actions], but that an official of higher rank who actually orders such [actions] is im-

---

**5.** *Keating v. Martin,* 638 F.2d 1121 (8th Cir. 1980), is not to the contrary. In *Keating,* this Court held that prosecutors and their investigative assistants were immune for their actions, including the dismissal of charges against an informant apparently in return for testimony against the plaintiff, "so long as the actions complained of appear to be within the scope of

prosecutorial duties." *Id.* at 1122. The actions in *Keating* were designed to aid in the prosecution of the plaintiff and thus were the type of "quasi-judicial" functions for which courts typically grant immunity. *Keating* therefore simply does not address the question of prosecutorial immunity for administrative and investigative actions affecting a complaining party.

mune simply because of his greater authority. Indeed, the greater power of such officials affords a greater potential for a regime of lawless conduct. Extensive Government operations offer opportunities for unconstitutional action on a massive scale. In situations of abuse, an action for damages against the responsible official can be an important means of vindicating constitutional guarantees. 438 U.S. at 505–06, 98 S.Ct. at 2910. These sentiments aptly fit this case as well.

### B.

■ We are thus left with the question of whether the state officials participating in the actions complained of are entitled to qualified immunity. The Supreme Court has held that "[e]ven defendants who violate constitutional rights enjoy a qualified immunity that protects them from liability for damages unless it is further demonstrated that their conduct was unreasonable under the applicable standard." *Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 3018, 82 L.Ed.2d 139 (1984). The standard applicable to this case was set forth in *Harlow.* The Court stated in *Harlow* that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." 457 U.S. at 818, 102 S.Ct at 2738. Subsequently, the Court made clear that qualified immunity for a constitutional violation is not defeated merely because an official's conduct violates some statutory or administrative provision. *Davis,* 104 S.Ct. at 3019–20. Thus, the only relevant question regarding immunity is whether the law allegedly violated was clearly established at the time of the conduct at issue. *See id.* at 3021; *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738. If the law was clearly established, "a reasonably competent public official" is presumed to know the law governing his conduct and the immunity defense should fail. 457 U.S. at 818–19, 102 S.Ct at 2738. As the Court has noted, this standard "gives ample room for mistaken judg-

ments" and protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* —— U.S. ——, 106 S.Ct. 1092, 1097, 1096, 89 L.Ed.2d 271 (1986).

We now turn to a brief examination of the Freemans' claims. Our task then will be to determine whether the law in the areas implicated in those claims was clearly established at the time of the actions here at issue and thus whether the state officials' qualified immunity defenses should fail.

### III.

■ We first observe that *pro se* complaints and supporting documents of the type now before us are entitled to indulgence upon review. *See Hughes v. Rowe,* 449 U.S. 5, 12–13, 101 S.Ct. 173, 177–78, 66 L.Ed.2d 163 (1980). The Freemans' third amended complaint contains four counts. Count One alleges that defendants knew or should have known that, under the Fourth and Fourteenth Amendments to the United States Constitution, a warrant was required to inspect the campground premises. Count One further alleges that defendants deprived the Freemans of their right to due process "by arbitrarily and capriciously" suspending their campground license because of their refusal to submit to a warrantless search. Thus, the latter allegation is one which in essence raises a claim of retaliation for the assertion of constitutional rights. Count Two contains claims under the South Dakota Constitution parallel to those of Count One. For the reasons expressed earlier, we do not address these claims separately. *See supra* note 2, at 170.

Count Three complains of defendants' failure to give the Freemans notice of the license suspension and an opportunity to be heard prior to the actual suspension of the license as allegedly required by the Fourteenth Amendment and the relevant provision of the South Dakota Constitution. The Freemans also assert that these actions were taken "as punishment for [their]

refusal to submit to a warrantless inspection." Third Amended Complaint, ¶ 45. Finally, Count Four is directed only at Attorney General Meierhenry. The Freemans allege that Meierhenry knew or should have known of the necessity to obtain a search warrant prior to inspecting the campground premises and of the necessity to give notice and an opportunity to be heard prior to suspending the Freemans' license. Nevertheless, according to the complaint, Meierhenry deliberately failed to inform the other defendants of these requirements and aided and abetted the other defendants in summarily suspending the Freemans' license in retaliation for the assertion of their Fourth Amendment rights.

We view the Freemans' complaint as raising the question of whether the law was clearly established in three separate areas: (1) warrantless administrative searches; (2) due process requirements relating to license suspensions; and (3) retaliatory actions in response to the assertion of constitutional rights. Because we believe that Count Four merely reiterates the allegations already contained in Counts One and Three, we are convinced that these three categories encompass the entirety of the Freemans' claims. We will address each area in turn below.

### A.

█ Defendants contend that it was reasonable for them to assume in 1982 and 1984 that a warrantless administrative inspection of the Freemans' campground pursuant to the South Dakota statutory scheme was permissible. Defendants argue that the courts widely have upheld warrantless administrative searches of commercial property and observe that whether a warrantless inspection is proper is determined on a case-by-case basis. *See v. City of Seattle*, 387 U.S. 541, 546, 87 S.Ct. 1737, 1741, 18 L.Ed.2d 943 (1967). While the latter contentions may be accurate, we believe that the law in this area was clearly established by 1982 and thus are unable to agree with defendants that it was reasonable for them to assume that

they properly could conduct warrantless searches of the Freemans' property.

█ The law has been settled for some time that administrative inspections of private commercial property are subject to the strictures of the Fourth Amendment. *Id.* at 543, 87 S.Ct. at 1739. Searches of commercial property no less than of residential property generally are unreasonable unless authorized by a valid search warrant. *See Marshall v. Barlow's, Inc.*, 436 U.S. 307, 312, 98 S.Ct. 1816, 1820, 56 L.Ed.2d 305 (1978); *Camara v. Municipal Court*, 387 U.S. 523, 528–29, 87 S.Ct. 1727, 1730–31, 18 L.Ed.2d 930 (1967). Because the expectation of privacy is significantly different between commercial and residential property, however, "legislative schemes authorizing warrantless administrative searches of commercial property do not necessarily violate the Fourth Amendment." *Donovan v. Dewey*, 452 U.S. 594, 598, 101 S.Ct. 2534, 2538, 69 L.Ed.2d 262 (1981). Even so, a warrant is required to conduct an inspection "unless some recognized exception to the warrant requirement applies." *Barlow's*, 436 U.S. at 313, 98 S.Ct. at 1820.

The Supreme Court has recognized exceptions to the search warrant requirement in the case of " 'pervasively regulated business[es],' *United States v. Biswell*, 406 U.S. 311, 316 [92 S.Ct. 1593, 1596, 32 L.Ed.2d 87] (1972), and for 'closely regulated' industries 'long subject to close supervision and inspection.' *Colonnade Catering Corp. v. United States*, 397 U.S. 72, 74, 77 [90 S.Ct. 774, 776, 777, 25 L.Ed.2d 60] (1970)." *Barlow's*, 436 U.S. at 313, 98 S.Ct. at 1820. The Court explained that "[t]he element that distinguishes these enterprises from ordinary businesses is a long tradition of close government supervision, of which any person who chooses to enter such a business must already be aware." *Id.* When the legislature "has reasonably determined that warrantless searches are necessary to further a regulatory scheme and the ... regulatory presence is sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be

subject to periodic inspections undertaken for specific purposes" a warrant may not be required by the Constitution. *Dewey,* 452 U.S. at 600, 101 S.Ct. at 2538. Defendants assert that the commercial campground industry in South Dakota is an industry of the type subject to this exception and that anyone who decided to engage in that business "could not help but be aware that his campground would be subject to effective inspections." Brief for Appellee at 25.

Even were we to conclude that the South Dakota commercial campground business is the type of "pervasively regulated" enterprise that the Court had in mind for this exception, the South Dakota statutes also would have to provide sufficiently detailed guidelines to assure the "certainty and regularity" of the warrantless inspections to qualify as a "constitutionally adequate substitute for a warrant." *Dewey,* 452 U.S. at 603, 101 S.Ct. at 2540. The Court has explained that warrantless inspections are constitutionally inadequate "if their occurrence is so random, infrequent, or unpredictable that the owner, for all practical purposes, has no real expectation that his property will from time to time be inspected by government officials." *Id.* at 599, 101 S.Ct. at 2538 (citing *Barlow's,* 436 U.S. at 323, 98 S.Ct. at 1826). Likewise, if the statutory scheme authorizes inspections but the legislature "made no rules governing the procedures that inspectors must follow, the Fourth Amendment and its various restrictive rules apply." *Dewey,* 452 U.S. at 599, 101 S.Ct. at 2538 (quoting *Colonnade,* 397 U.S. at 77, 90 S.Ct. at 777). In these instances, a war-

rant is necessary to insure that reasonable standards for conducting inspections exist and to protect commercial property owners from the "almost unbridled discretion [of] executive and administrative officers ... as to when to search and whom to search." *Barlow's,* 436 U.S. at 323, 98 S.Ct. at 1826.

The statutory authority relied upon by defendants consists of sections 34–18–24 and 34–18–26 of the South Dakota Codified Laws. Section 34–18–24 directs the secretary of health to "periodically inspect or cause to be inspected every ... campground operating within this state for compliance with the provisions of this chapter and the rules and regulations of the department of health." Section 34–18–26 grants the secretary "the right of entry and access to all areas ... at any reasonable time" for purposes of conducting the inspection required by section 34–18–24. Because we conclude that these provisions for warrantless administrative inspections do not meet the clearly established standards set forth above, we need not decide whether the commercial campground industry would fall within the *Colonnade-Biswell* exception.[6]

A cursory review of the statutes quoted above reveals that they do not comply with the requirements set forth in *Dewey* and its precursors. The direction to inspect "periodically" does not "specifically define[ ] the frequency of inspection," *Dewey,* 452 U.S. at 604, 101 S.Ct. at 2540, and is so "unpredictable that the owner, for all practical purposes, has no real expectation that his property will ... be inspected by

---

**6.** Defendants assert that the South Dakota legislature had determined that warrantless inspections were crucial to the objectives of health and safety in campgrounds and that requiring a search warrant would undermine efficient and effective enforcement of the regulatory scheme. This may be so but these considerations do not obviate the need to comply with constitutional requirements for the enforcement of regulatory schemes of this nature. Further, as the Court observed in *Barlow's:*

For purposes of an administrative search such as this, probable cause justifying the issuance of a warrant may be based not only on specif-

ic evidence of an existing violation but also on a showing that "reasonable legislative or administrative standards for conducting an ... inspection are satisfied with respect to a particular [establishment]." A warrant showing that a specific business had been chosen for ... [a] search on the basis of a general administrative plan for the enforcement of [a statutory scheme] derived from neutral sources ... would protect an employer's Fourth Amendment rights.

436 U.S. at 320–21, 98 S.Ct. at 1824–25 (citations omitted).

government officials." *Id.* at 599, 101 S.Ct. at 2538.[7] Moreover, the authority granted by section 34–18–26 to inspect "all areas ... at any reasonable time" is given without providing executive branch officials and administrators any standards to govern the selection of businesses to search or the procedures to follow in conducting those searches. *Cf. Barlow's*, 436 U.S. at 320–21, 98 S.Ct. at 1824–25. We need not explore the adequacy of the South Dakota statutory scheme any further because we are certain that this authority is so broad that "the Fourth Amendment and its various restrictive rules apply." *Colonnade*, 397 U.S. at 77, 90 S.Ct. at 777.[8] We believe that this conclusion follows from what was clearly established law at the time Blair and Massa were facing their decisions. Since they are presumed to know the law governing their conduct, *Harlow*, 457 U.S. at 818–19, 102 S.Ct at 2738, their claims of immunity must fail.[9]

### B.

■ Procedural due process limits governmental actions depriving individuals of "liberty" or "property" interests within the meaning of the Due Process Clause of the Fourteenth Amendment. *Mathews v. Eldridge*, 424 U.S. 319, 332, 96 S.Ct. 893, 901, 47 L.Ed.2d 18 (1976). Section 34–18–27 of the South Dakota Codified Laws provides that "[t]he secretary of health, upon determining the existence of a hazardous condition that may immediately endanger human life or be seriously detrimental to public health[,] may ... summarily suspend the license of any ... campground ... in this state."[10] Defendants do not contend that procedural due process is inapplicable to suspensions of state-granted occupational or business licenses. Rather, defendants, citing *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), and *Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), assert that because the actions in issue were "unauthorized," due process was satisfied by the existence of an adequate post-deprivation remedy under state law.

In *Parratt*, a state employee negligently lost a prison inmate's hobby kit. The Court concluded that the prisoner had suf-

---

**7.** The parties also contest whether inspections conducted by the Department in the past in fact have been regular and predictable. Defendants contend that campgrounds in South Dakota were inspected an average of once every 14.8 months between the years of 1970 and 1985. The Freemans on the other hand assert that their campground has been inspected irregularly. They argue that the campground was inspected only in 1974, 1980, and 1982. If the statute were not deficient on its face, this dispute would more appropriately be resolved by the finder of fact than by summary judgment. We note, however, that the relevant question would be whether the Department had inspected the particular establishment, *i.e.*, the Belvidere East K.O.A., on a sufficiently certain and regular basis. *See Dewey*, 452 U.S. at 603, 101 S.Ct. at 2540; *Barlow's*, 436 U.S. at 320–21, 98 S.Ct at 1824–25.

**8.** The Freemans' complaint also may state a claim under section 1983 for violation of the Fourth Amendment if their consent to the search conducted in 1982 was obtained by threats of criminal prosecution or other means of coercion. *Cf. Schneckloth v. Bustamonte*, 412 U.S. 218, 228, 93 S.Ct. 2041, 2048, 36 L.Ed.2d 854 (1973); *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 1791, 20 L.Ed.2d 797 (1968). Because the parties have not briefed this issue, we do not analyze it separately. This matter will be an appropriate subject for review before the District Court on remand should the parties wish to raise it.

**9.** Defendants also argue that because the constitutional adequacy of the South Dakota statutes had never been weighed by any court, they were entitled to rely on the presumptive validity of the statutes. Had the requirements for a valid statutory scheme of the type at issue in this case not been already well established, we might agree. Given the extensive exposition by the Supreme Court concerning the requisites for this type of legislative scheme, however, we are unable to agree. This is particularly the case since in effect the constitutional adequacy of these statutes was questioned by the Freemans and therefore brought to the attention of the relevant state officials.

**10.** Section 1–26–29 states that "[i]f the agency finds that public health, safety, or welfare imperatively require emergency action, and incorporates a finding to that effect in its order, summary suspension of a license may be ordered pending proceedings for revocation or other action. These proceedings shall be promptly instituted and determined."

fered a deprivation of property within the meaning of the Fourteenth Amendment but held that "takings of property without any predeprivation process" are permissible under the due process clause when the loss is the "result of a random and unauthorized act by a state employee" rather than "a result of some established state procedure." 451 U.S. at 541, 101 S.Ct. at 1916. This conclusion followed from the recognition that it was "not only impracticable, but impossible" for a state to provide a meaningful hearing before that type of deprivation takes place. *Id.* The Court determined that the availability of a meaningful post-deprivation hearing satisfied the requirements of procedural due process because there were state remedies that could have fully compensated the plaintiff, even though those remedies may not have been as extensive as the remedies available under section 1983. *Id.* at 537–44, 101 S.Ct. at 1913–17. In *Hudson,* the Court extended this rationale to intentional as well as negligent deprivations of property. 104 S.Ct. at 3204.

The Freemans' complaint asserts that defendants violated their due process rights "by arbitrarily and capriciously suspending [their] license" because they refused to submit to the warrantless searches. *See* Third Amended Complaint, ¶¶ 35–36. Defendants contend that the Freemans are complaining about unauthorized application of state procedures on the part of defendants, to wit, that defendants failed to comply with the statutory procedures governing summary suspension of campground licenses set forth in section 34–18–27. Defendants argue, therefore, that it was impossible for the State to provide a predeprivation hearing because the State could not have predicted the unauthorized acts of its employees in failing to follow the statutory guidelines. Thus, they conclude that *Parratt* and *Hudson* indicate that no predeprivation hearing was required in these cir-

cumstances because state law provides the Freemans with an adequate remedy.[11]

■ We reject this argument. Our Court recently has observed that "*Parratt* ... applies only if a determination has been made that a predeprivation hearing is not required." *Littlefield v. City of Afton,* 785 F.2d 596, 600 (8th Cir.1986). In *Logan v. Zimmerman Brush Co.,* the Supreme Court reiterated that "absent 'the necessity of quick action by the State or the impracticality of providing any predeprivation process,' a postdeprivation hearing ... would be constitutionally inadequate." 455 U.S. 422, 436, 102 S.Ct. 1148, 1158, 71 L.Ed.2d 265 (1982) (quoting *Parratt,* 451 U.S. at 539, 101 S.Ct. at 1915). We are unable to conclude that providing a predeprivation hearing here was "impracticable." Surely decisions made by the highest officials in the executive branch of state government who have final authority over matters for which they are responsible do not constitute "random and unauthorized" acts. *See Pembaur v. City of Cincinnati,* — U.S. ——, 106 S.Ct. 1292, 1299, 89 L.Ed.2d 452 (1986) ("If the decision to adopt that particular course of action is properly made by that government's authorized decisionmakers, it surely represents an act of official government 'policy' as that term is commonly understood."); *Giglio v. Dunn,* 732 F.2d 1133, 1137 (2d Cir.) (Cardamone, J., dissenting), *cert. denied,* — U.S. ——, 105 S.Ct. 328, 83 L.Ed.2d 265 (1984). The state officials in this case who decided to search the Freemans' campground without a warrant and to suspend the Freemans' campground license when they refused to submit to that search were senior-level officials. These officials knew what actions were going to be taken because they were responsible for making the decisions. Consequently, a predeprivation hearing easily could have been provided.[12]

---

11. Chapter 21–32 of the South Dakota Codified Laws provides a cause of action against state officials in common law tort.

12. In addition, the cases of *Bell v. Burson,* 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971), and *Mackey v. Montrym,* 443 U.S. 1, 99 S.Ct.

2612, 61 L.Ed.2d 321 (1979), both dealing with the suspension of driving privileges, lend support to the judgment that a predeprivation hearing was necessary here. In *Bell,* the Court found that due process necessitated a hearing before a person's driver's license could be sus-

Defendants also contend, somewhat inconsistently, that instead of their actions being "unauthorized," it was reasonable for them to conclude that "their inability to conduct a warrantless inspection ... [indicated] that a hazardous condition existed." Brief for Appellee at 33. Defendants claim that this action was consistent with and authorized by section 34–18–27 and that they were entitled to presume that this statute was valid. Whatever validity this assertion might have were the underlying inspection scheme constitutionally adequate, it cannot serve here to insulate defendants from liability. As we have concluded above, defendants knew or should have known that the statutory inspection scheme was constitutionally deficient. Since defendants were not entitled to search without a warrant and, at the least, should have known this, they hardly can be entitled to assume for purposes of summarily suspending the Freemans' license that a hazardous condition existed when they were refused permission to make that search. Blair publicly conceded that he knew of no statutory or regulatory violations at the campground at the time of his action suspending the license. Although Massa included in his license suspension order the finding required by section 1–26–29, *see supra* note 10, at 176, nothing appears in the record to support this and therefore his conclusory finding does not alter our determination in this regard. We are convinced that defendants cannot satisfy the "necessity of quick action" exception to the requirement of a predeprivation hearing. We therefore conclude that the due process requirement of a

predeprivation hearing in circumstances such as the ones existing here was "clearly established" at the time and that defendants' claim of immunity should fail on this issue as well.

### C.

Finally, although neither party directly addressed the claim in its brief, the complaint asserts that defendants' actions were taken "because of" and "as punishment for" the Freemans' refusal to submit to warrantless searches. Because we believe that this language constitutes a separate claim, we briefly discuss the law dealing with retaliation for the assertion of constitutional rights.

It would seem an elementary proposition that actions taken in retaliation for an individual's assertion of a constitutional right are impermissible. The Supreme Court in *Mount Healthy City Board of Education v. Doyle* stated that "[e]ven though [a teacher] could have been discharged for no reason whatever, and had no constitutional right to a hearing prior to the decision not to rehire him, he may nonetheless establish a claim to reinstatement if the decision not to rehire him was made by reason of his exercise of constitutionally protected First Amendment freedoms." 429 U.S. 274, 283–84, 97 S.Ct. 568, 574, 50 L.Ed.2d 471 (1977) (citation omitted). Indeed, we believe that "it is well established that an act in retaliation for the exercise of a constitutionally protected right is actionable under Section 1983 even if the act, when taken for a different reason, would have been proper." *Buise v.*

pended under a statute requiring any driver involved in an accident to furnish security or proof of financial responsibility. 402 U.S. at 542, 91 S.Ct. at 1591. The Court held that before any suspension the State must hold a hearing to determine whether a "reasonable possibility" of a judgment against the person was likely. *Id.* In *Mackey*, the Court upheld a statute requiring suspension of a person's license for failing to submit to a blood-alcohol test. The statute provided for a prompt post-suspension hearing to ascertain whether the suspension was justified. The Court, applying *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18

(1976), determined that the governmental interest in protecting the public from drunk drivers outweighed the potential for an erroneous deprivation of a person's license without a pre-suspension hearing. 443 U.S. at 17, 19, 99 S.Ct. at 2620, 2621. In essence, the result in both cases hinges largely on the likelihood of an erroneous deprivation. We believe that that likelihood here is sufficiently great, particularly since defendants concede that they had no knowledge of any hazardous condition at the Freemans' campground, to outweigh any interests of the State.

*Hudkins*, 584 F.2d 223, 229 (7th Cir.1978), *cert. denied*, 440 U.S. 916, 99 S.Ct. 1234, 59 L.Ed.2d 466 (1979); *see Harrison v. Springdale Water & Sewer Commission*, 780 F.2d 1422, 1428 (8th Cir.1986). Although this case involves the assertion of a Fourth Amendment right rather than one under the First Amendment, the principle is the same. It is so deeply embedded in the legal and social fabric of our society that no high-level government official could fail to know of it.

### IV.

For the reasons stated above, we reverse the decision of the District Court and remand for further proceedings consistent with this opinion.