HOLT BONDING CO., INC., Plaintiff,

v.

Lonnie NICHOLS, Defendant.

Civil No. 96–3057.

United States District Court,
W.D. Arkansas,
Harrison Division.

Sept. 18, 1997.

Robert J. Price, Price Law Firm, Little Rock, AR, for Plaintiff.

Robert A. Russell, Jr., Duncan & Rainwater, Little Rock, AR, for Defendant.

## MEMORANDUM OPINION

H. FRANKLIN WATERS, District Judge.

Plaintiff, Holt Bonding Co., Inc. (HBCI), filed this 42 U.S.C. § 1983 action against Lonnie Nichols in his individual capacity. HBCI alleges that its professional bail bond company license was suspended by Nichols, then the sheriff of Carroll County, when it refused to forfeit bonds in two cases. Trial was originally set for the week of July 7, 1997. Shortly before the scheduled trial date, the parties agreed that the issues to be resolved were solely issues of law and that the case could be submitted to the court for decision based on joint stipulation of facts and briefs of the parties.

## I. JOINT STIPULATION OF FACTS

1. HBCI is an Arkansas Corporation with its principal place of business at Harrison, Boone County, Arkansas; its president is John Holt.

2. HBCI is a Professional Bail Bonding Company, which, at all times relevant to its complaint, had a license from the State of Arkansas through the Arkansas Professional Bail Bondsman Licensing Board (Board) to act as a Professional Bail Bond Company within the State of Arkansas.

3. At all times relevant to its complaint, HBCI had posted a letter of credit or certificate of deposit with the Board, approved by the Board as to form and sufficiency, in the minimum amount of $20,000.00, conditioned upon faithful performance of the duties of the license, as required by Ark.Code Ann. § 17–19–205(a)(1) (Michie 1995).

4. Nichols is an adult resident of Carroll County, Arkansas, who at all times relevant to HBCI's complaint was the elected Sheriff of Carroll County, Arkansas.

5. At all times relevant to HBCI's complaint, Nichols had knowledge of the nature of HBCI's business and that HBCI was licensed by the State of Arkansas to act as a

Professional Bail Bond Company within the State of Arkansas.

6. At all times relevant to HBCI's complaint, persons who were taken into custody by either the Carroll County Sheriff's Office or a police agency operating within Carroll County were taken to the Carroll County Jail for booking and, if applicable, incarceration.

7. At all times relevant to HBCI's complaint, all bail bonds for persons incarcerated in the Carroll County Jail were posted through and accepted by Carroll County Sheriff's deputies.

8. On April 4, 1995, HBCI was ordered to forfeit bond in the amount of $5,000.00 in the case of *State v. Carl Ford,* Carroll County Circuit Court Case No. CR93–160–1.

9. On September 8, 1995, John Holt, d/b/a Holt Bonding Company, Inc., was served a summons for a show-cause hearing scheduled for September 11, 1995, on the bond forfeiture in the case of *State v. Carl Ford,* Carroll County Circuit Court Case No. CR93–160–1.

10. On September 11, 1995, a hearing was conducted on the bond forfeiture in the case of *State v. Carl Ford,* Carroll County Circuit Court Case No. CR93–160–1; HBCI did not appear at the meeting.

11. Nichols directed that bonds from HBCI would not be accepted in Carroll County, and caused signs to be posted at the Carroll County Jail which stated, "CARROLL COUNTY WILL NOT ACCEPT ANY BONDS FROM HOLT BONDING. THIS INCLUDES BERRYVILLE P.D. AND CARROLL COUNTY S.O.;" John Holt would testify that this occurred on or about September 25, 1995, and that an identical sign was also posted at the Boone County Jail; Nichols would testify that it occurred after Judge Coxsey's November 15, 1995 Order, and that the sign at the Boone County Jail was not posted at his direction.

12. On November 15, 1995, Berryville Municipal Judge Kent Coxsey ordered by letter that no bonds be written by HBCI until further notice.

13. On January 24, 1996, judgment was entered in the case of *State v. Richard Ford,* Berryville Municipal Court Case No. 95–468; wherein HBCI was ordered to forfeit bond of $2,730.00.

14. As of February, 29, 1996, HBCI had not forfeited bond in the case of *State of Carl Ford,* Carroll County Circuit Case No. CR93–160–01.

15. On February 29, 1996, Nichols stated his reasoning for his refusal to accept bonds from HBCI, by letter sent to John Holt.

16. On May 8, 1996, Judge Kent Coxsey entered an Order setting aside the January 24, 1996, bond forfeiture in the amount of $2,730.00, instead ordering the forfeiture of $500.00 in the case of *State v. Richard Ford,* Berryville Municipal Court Case No. 95–468; the amount was paid by HBCI in a timely fashion.

17. On May 8, 1996, Judge Coxsey lifted his November 15, 1995, ban against HBCI.

18. On May 8, 1996, Sheriff Nichols began accepting bonds by HBCI.

19. For a period beginning on or about either September 25, 1995 (per John Holt) or November 15, 1995 (per Lonnie Nichols) through on or about May 8, 1996, at the direction of Nichols, the Carroll County Sheriff's Office refused to accept any bail bonds from HBCI or any of its agents.

20. John Holt would testify that:

(a) Jesse Ward's only authority to act on behalf of HBCI is to write bonds for HBCI; it is set forth in a power of attorney and is included within each bail bond written by Jesse Ward.

(b) No officer or director with authority to act on behalf of HBCI was given prior notice that the restriction of its activities in Carroll County were being considered, or ever examined on oath in regard to HBCI's qualifications as a surety; neither Nichols nor anyone acting under his authority ever administered such an oath to any officer of director with authority to act on behalf of HBCI, nor did they take statements, reduce such statements to writing, or require any signatures from anyone with authority to act on behalf of HBCI in regard to the sufficiency of HBCI as a surety.

(c) If John Holt or any other officer or director with authority to act on behalf of HBCI had been examined on oath in regard to HBCI's qualifications as surety, specifical-

ly with regard to any unpaid bond forfeitures, the person doing so would have learned that:

(d) HBCI has always paid in timely fashion all valid final civil judgments for court ordered bond forfeitures entered against it concerning bonds upon which it acted as surety.

(e) Any unpaid bond forfeitures were not paid by HBCI because they were not valid final judgments for court-ordered bond forfeitures.

(f) HBCI did not receive proper notice in either of the *Ford* cases and was at all times legally justified and acting properly when it did not pay invalid bond forfeitures.

(g) A statutory procedure exists whereby unpaid valid final judgments for court ordered bond forfeitures may be collected from the letter of credit or certificate of deposit which Professional Bail Bonding companies maintain with the Board. *See* Ark.Code Ann. § 17–19–208(b)(1) (Michie 1995).

(h) Neither the State of Arkansas, the Circuit Court of Carroll County, or the Berryville Municipal Court made any attempts whatsoever to utilize the procedure in Ark. Code Ann. § 17–19–208(b)(1) in the *Ford* cases.

(i) HBCI sustained damages as the proximate result of Carroll County Sheriff Office's refusal to accept its bonds

21. Lonnie Nichols would testify that:

(a) He had knowledge in April of 1995, that HBCI failed to forfeit a $5,000.00 bond pursuant to a Circuit Judge's Order.

(b) He had knowledge in September, 1995, that the Circuit Judge ordered HBCI to show-cause why the bond was forfeited and HBCI did not appear.

(c) He told Jesse Ward, a bondsman for HBCI, that the forfeiture had not been paid and if the bond was not forfeited or the body was not brought in, the county would not accept HBCI bonds.

(d) He does not know whether Jesse Ward conveyed these discussions to John Holt or anyone entitled to receive notice for HBCI.

(e) After Judge Coxsey's November 15, 1996, order, he posted a sign in facilities holding Carroll County detainees which stated, "CARROLL COUNTY WILL NOT ACCEPT ANY BONDS FROM HOLT BONDING. THIS INCLUDES BERRYVILLE, P.D. AND CARROLL COUNTY S.O."

(f) The reason the Sheriff acted was, "HBCI's lack of performance. Plain and simple. HBCI wasn't taking care of business. All other bondsmen were—they would either produce the body or forfeit the bond. That is the idea behind bonding. That is my understanding of it and that leaves me, as the sheriff, with the responsibility of finding this individual and going to the expense of finding that individual and, therefore, I feel like that is my obligation to see that they performed."

22. At all times relevant to HBCI's complaint, Nichols was acting under color of state law.

## II. DISCUSSION

HBCI contends that its Fourteenth Amendment due process rights were violated when Nichols took adverse action against its license without notice or hearing. Specifically, HBCI alleges that when Nichols, acting in his capacity as Sheriff of Carroll County, ordered the Carroll County Sheriff's Office not to accept bonds from HBCI, his actions constituted a suspension of HBCI's bail bond company license. HBCI contends that it has a protected property interest in its bail bond company license and that the suspension of its license constituted a deprivation of its property interest without notice and hearing.

■ This court finds that under Arkansas law, Nichols' suspension of HBCI's authority to issue bonds in Carroll County is equivalent to a suspension of HBCI's license. *See United Bonding Co. v. Johnson*, 293 Ark. 467, 468, 739 S.W.2d 147, 148 (1987) (trial court's suspension of bonding company's authority to issue bonds was the same as a suspension of bonding company's license). Nichols argues that he was acting pursuant to Judge Coxsey's order, the Municipal Court Judge for Berryville, Arkansas. There is no merit in that argument. First, Judge Coxsey had no statutory authority to suspend HBCI's authority to issue bonds. Only the Board has the authority to suspend licenses. Ark.Code

Ann. § 17–19–210 (Michie 1995). In addition, even if Judge Coxsey's order was valid, it only directed that no bonds be written by HBCI for the Berryville Municipal Court. Nichols unilaterally extended the order to the Carroll County Sheriff's Office.

Nichols also argues that he was acting pursuant to the discretionary power he possesses to accept or not accept bail.[1] The Arkansas Code states that a sheriff may take bail. Ark.Code Ann. § 16–84–102(a)(2) (Supp.1995). To "take bail" means "the acceptance by a person authorized to take bail of the undertaking of a sufficient surety for the appearance of the defendant according to the terms of the undertaking, or that the surety will pay to the court the sum specified...." Ark.Code Ann. § 16–84–101(5) (Supp.1995). "A surety shall be: (1) a professional bondsman acting through a professional bail bond company; or (2) a resident of the state...." Ark.Code Ann. § 16–84–103(a) (Supp.1995). "The person or persons offered as a surety shall be examined on oath in regard to their qualifications ... Other proof may also be taken in regard to the sufficiency of the surety." Ark.Code Ann. § 16–84–103(b)(1) (Supp.1995). "Proof that the surety is a professional bail bondsman shall be deemed sufficient proof of the sufficiency of the surety and the surety may be accepted by all courts in this state or by any officer of the court authorized to take bail." Ark.Code Ann. § 16–84–103(b)(2) (Supp.1995). "The chief law enforcement officers of any facilities having individuals or prisoners in their custody shall post in plain view ..." a list that contains the names of the professional bail bond companies. Ark.Code Ann. § 17–19–306(a)(1) & (2) (Michie 1995).

Thus, any professional bail bondsman, acting through HBCI, qualified as a surety under Arkansas law, and Nichols did not possess any statutory authority to disqualify a professional bail bondsman or professional bail bond company. That authority is given to the Board in Ark.Code Ann. § 17–19–210 (Michie 1995), which states that the Board may suspend a license for various violations of the rules and regulations governing bail

bondsmen and bail bond companies. If Nichols was concerned about HBCI's failure to forfeit the bonds in the *Ford* cases, he should have filed a complaint alleging such violations and the Board would have conducted a hearing on the issue. *See* Ark.Code Ann. § 17–19–209 (Michie 1995).

HBCI has a valid argument that Nichols did not comply with the requirements of Arkansas law when he refused to accept HBCI's bonds. However, while the actions may constitute violations of state law, it does not necessarily follow that such violations implicate the federal Constitution. *First Assembly of God of Naples, Florida, Inc. v. Collier County, Fla.,* 20 F.3d 419, 421 (11th Cir.1994), *cert. denied,* 513 U.S. 1080, 115 S.Ct. 730, 130 L.Ed.2d 634 (1995). *See also, Harris v. Birmingham Bd. of Education,* 817 F.2d 1525, 1527–28 (11th Cir.1987). "If otherwise, federal courts would have the task of insuring strict compliance with state procedural regulations and statutes." *Harris,* 817 F.2d at 1528. Thus, the focus of our inquiry must be "whether such a procedural failure rises to the level of a federal constitutional violation." *First Assembly,* 20 F.3d at 422.

"Every person who, under color of any statute, ... subjects, or causes to be subjected, any citizen ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law...." 42 U.S.C. § 1983 (1994). HBCI brings its § 1983 claim against Nichols in his individual capacity, seeking to impose personal liability on Nichols for his actions taken under color of state law. HBCI contends that Nichols' actions deprived it of its Fourteenth Amendment right to due process.

Nichols devotes a portion of his brief to a substantive due process analysis of HBCI's § 1983 claim, contending that there was a "rational relation between the action taken and a legitimate state objective." *Defendant's Brief* at 2. We believe that Nichols' arguments are misplaced.

---

**1.** Nichols' brief cites various Arkansas statutes in Title 16, Chapter 84, Subchapter 1, to support his arguments. However, Nichols refers to statutes that were revised and recodified in 1989.

*See* 1989 Ark.Acts 417. This court will use the language of the current statutes, as they were in effect at all times relevant to HBCI's claim.

By *substantive review* we mean the judicial determination of the compatibility of the substance of a law or governmental action with the Constitution. The Court is concerned with the constitutionality of the underlying rule rather than with the fairness of the process by which the government applies the rule to an individual. Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law*, § 14.6 (2d ed.1992). "Procedural due process guarantees only that there is a fair decision making process before the government takes some action impairing a person's life, liberty or property." *Id.* While it is true that Fourteenth Amendment violations include substantive and procedural due process deprivations, both of which may be actionable under § 1983, HBCI has only asserted a claim for a procedural due process deprivation, stating in its brief that, "its § 1983 claim against Lonnie Nichols is for due process violations, specifically, adverse action against its license without notice or hearing." *Plaintiff's Brief in Conjunction with Joint Stipulation of Facts* at 1.[2] Thus, this court will not address Nichols' substantive due process arguments.

■ To state a claim under 42 U.S.C. § 1983, a plaintiff must allege and prove two essential elements: (1) that defendant acted under color of state law and (2) that defendant's actions violated plaintiff's constitutional rights. *See Marler v. Missouri State Bd. of Optometry*, 102 F.3d 1453, 1455–56 (8th Cir.1996).

HBCI alleges that Nichols' actions violated its Fourteenth Amendment right to due process. The Fourteenth Amendment of the Constitution provides in part:

No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const. amend. XIV. "Because the Amendment is directed at the States, it can be violated only by conduct that may be fairly characterized as 'state action'." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 924, 102

S.Ct. 2744, 2747, 73 L.Ed.2d 482 (1982). For HBCI to state a cause of action based on a Fourteenth Amendment violation, he must show Nichols' conduct constituted both color of law and state action. In *Lugar*, the Supreme Court held that, "it is clear that in a § 1983 action brought against a state official, the statutory requirement 'under color of law' and the 'state action' requirement of the Fourteenth Amendment are identical." *Id.* at 929, 102 S.Ct. at 2749. Because the parties have stipulated that Nichols was acting under color of state law, we find that state action is also present in this case. Thus, HBCI has established the first essential element of its § 1983 action.

We now turn to the second essential element—whether Nichols' actions violated HBCI's constitutional rights. Specifically, whether HBCI was deprived of its Fourteenth Amendment right to due process.

■ Procedural due process requirements only apply to the deprivation of interests encompassed by the Fourteenth Amendment's protection of property and liberty. *Board of Regents v. Roth*, 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972). Whether a protected property interest exists is a matter of state law. *Cleveland Bd. of Education v. Loudermill*, 470 U.S. 532, 538, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494 (1985). Nichols appears to concede that HBCI has a protected property interest in its professional bail bond company license and Nichols does not argue that he did not deprive HBCI of this interest.

As we stated above, HBCI has proven the first element of a valid due process claim: that Nichols acted under color of state law. In addition, HBCI has established portions of the second element of a valid due process claim: that it has a protected property interest in its license and that Nichols deprived it of this property interest. "Standing alone, however, these ... elements do not establish a violation of the Fourteenth Amendment". Nothing in the Fourteenth Amendment protects against all deprivations of life, liberty or property by the State. The Fourteenth Amendment protects only against deprivations "without due process of law." *Parratt*

---

2. In addition, no substantive due process claim is      asserted by HBCI in its complaint.

*v. Taylor,* 451 U.S. 527, 537, 101 S.Ct. 1908, 1913–14, 68 L.Ed.2d 420 (1981) (*citing Baker v. McCollan,* 443 U.S. 137, 145, 99 S.Ct. 2689, 2695, 61 L.Ed.2d 433 (1979)). Our inquiry, therefore, must focus on whether Nichols has suffered a deprivation of property without due process of law. *Id.*

■ "Due process" requires adequate notice and an opportunity to be heard "at a meaningful time and in a meaningful manner." *Marler,* 102 F.3d at 1456 (*citing Post v. Harper,* 980 F.2d 491, 493 (8th Cir.1992)) (*quoting Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965)). "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Memphis Light, Gas & Water Division v. Craft,* 436 U.S. 1, 13, 98 S.Ct. 1554, 1562, 56 L.Ed.2d 30 (1977) (*quoting Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950) (citations omitted)). Nichols contends that he told Jesse Ward, a bail bondsman for HBCI, that Carroll County would no longer accept bonds from HBCI, however, Nichols admits that he does not know that Mr. Ward ever conveyed the message to HBCI. Thus, we find that HBCI did not receive adequate notice that action was going to be taken against its license.

■ The Due Process Clause guarantees the right to a fair decisional process. "An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *Loudermill,* 470 U.S. at 542, 105 S.Ct. at 1493 (*quoting, Mullane,* 339 U.S. at 313, 70 S.Ct. at 656). HBCI does not state in its brief what procedure is required in this case; whether due process requires a personal hearing prior to the state's action, or a hearing that takes place after the state's action. HBCI contends only generally that it had a right to notice and a hearing. "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Mathews v. Eldridge,* 424 U.S. 319, 321, 96 S.Ct. 893, 896, 47 L.Ed.2d 18 (1976)

(*quoting, Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972)).

■ A balancing test is utilized to determine what procedure will be required. In *Mathews v. Eldridge* the court outlined three factors to be used in making the decision:

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335, 96 S.Ct. at 902.

"In many of the cases where the Court has found that there is a deprivation of life, liberty or property it has required that the affected individual be granted a personal hearing prior to the government action." Rotunda & Nowak, *supra,* at § 17.8 (footnote omitted). "However, in some cases the Court has held that hearings which take place after the government action will be sufficient process to comply with the guarantee." *Id.* (footnote omitted). "And in a few cases the Court has held that due process was satisfied by a procedural safeguard which did not involve any personal hearing for the affected individual." *Id.* (footnote omitted).

In determining what type of hearing, if any, is required to satisfy due process in this case, we believe the *Parratt–Hudson* doctrine to be applicable. In *Parratt v. Taylor,* the Supreme Court determined that § 1983 had no express state of mind requirement. *Parratt,* 451 U.S. at 534–35, 101 S.Ct. at 1912–13. *Parratt* involved a § 1983 claim for damages brought by an inmate against two prison officials for negligently depriving him of his property without due process of law. *Id.* at 530, 101 S.Ct. at 1910. The plaintiff in *Parratt* was a prison inmate who alleged that prison officials had lost a hobby kit that he had ordered by mail. *Id.* The Supreme Court held that negligence was actionable under § 1983 and that the prisoner had suffered a deprivation of property within the

meaning of the Fourteenth Amendment. *Id.* at 536, 101 S.Ct. at 1913.

In determining what type of process was due, the Court recognized that in some cases it has held that due process requires a predeprivation hearing before the state can interfere with a person's property interest. *Id.* at 537, 101 S.Ct. at 1914. "In most of these cases, however, the deprivation of property was pursuant to some established state procedure and 'process' could be afforded before any actual deprivation took place." *Id.* (See, e.g., *Bell v. Burson,* 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971) (state statute provided for the suspension of the driver's license of an uninsured motorist involved in an accident; the Court held that a driver's license may be essential in the pursuit of a person's livelihood and could not be taken without a prior hearing)).

██ The Court in *Parratt* rejected the inmate's arguments that he should have received a predeprivation hearing by holding that it was "not only impracticable, but impossible" for a state to provide a meaningful predeprivation hearing because the deprivation was the result of a random and unauthorized act by a state employee. *Id.* The Court determined that a meaningful postdeprivation hearing satisfied the requirements of procedural due process because there were state remedies that could fully compensate plaintiff. *Id.* at 541, 101 S.Ct. at 1916. Therefore, if a plaintiff's federal constitutional rights are violated as a result of a "random and unauthorized act" by a state employee, then due process may not require that plaintiff receive a predeprivation hearing.

In *Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 3204, 82 L.Ed.2d 393 (1984), the Court extended the holding of *Parratt* to intentional deprivations of property stating that, "if negligent deprivations of property do not violate the Due Process Clause because a predeprivation process is impracticable, it follows that intentional deprivations do not violate that Clause provided, of course, that adequate state post deprivation remedies are available." In its holding the Court stated:

> [a]ccordingly, we hold that an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause if a meaningful postdeprivation remedy for the loss is available. For intentional, as for negligent deprivations of property by state employees, the state's action is not complete until and unless it provides or refuses to provide a suitable postdeprivation remedy.

*Id.* The respondent in *Hudson* argued that a predeprivation hearing was possible because the agent of the state who intended to deprive him of his property could have provided predeprivation process. *Id.* at 534, 104 S.Ct. at 3204. The Court responded to that argument by stating, "[w]hether the individual employee himself is able to foresee a deprivation is simply of no consequence. The controlling inquiry is solely whether the state is in a position to provide for predeprivation process." *Id.*

██ The Court in *Hudson* also made it clear that a postdeprivation hearing does not satisfy due process where the property deprivation is effected pursuant to established state procedure. *Id. See also, Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 436, 102 S.Ct. 1148, 1158, 71 L.Ed.2d 265, 278 (1982) (a predeprivation rather than a postdeprivation process should be required whenever there is an established state procedure that would take a property interest).

Finally, the Court in *Hudson* determined that because several common-law remedies were available to the plaintiff to obtain compensation for his property loss, the State had provided an adequate postdeprivation remedy, thus plaintiff had not been denied due process under the Fourteenth Amendment. *Id.* at 535–36, 104 S.Ct. at 3204–05. *Parratt* was overruled in part by *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). In *Daniels,* the Court overruled that portion of *Parratt* which held that negligence by a state actor was enough to constitute a deprivation of an individual's constitutional rights. *Id.* at 330–31, 106 S.Ct. at 664. In *Daniels,* a prison inmate brought a § 1983 action to recover damages for injuries he allegedly sustained when he slipped on a pillow negligently left on a stairwell by a sheriff's deputy. *Id.* at 328, 106 S.Ct. at 663. In rejecting the holding of *Parratt,* the Court stated, "we ... overrule *Parratt* to the ex-

tent that it states that mere lack of due care by a state official may 'deprive' an individual of life, liberty, or property under the Fourteenth Amendment." *Id.* at 330–31, 106 S.Ct. at 664.

The Eighth Circuit discussed the *Parratt–Hudson* doctrine in *Freeman v. Blair,* 793 F.2d 166 (8th Cir.1986). In *Freeman,* the plaintiffs, the Freemans, owned and operated a K.O.A. Kampground. *Id.* at 169. The defendants, officials from the South Dakota Department of Health (Department), arrived at the campground and requested permission to conduct an inspection. *Id.* The Freemans denied their request because the Department did not have a search warrant. *Id.* Shortly thereafter, the Department suspended their campground license without a hearing. *Id.* The Freemans filed a § 1983 claim against various Department officials and against the Department alleging that their rights under the Fourteenth Amendment had been violated. *Id.* at 170.

The defendants argued, based on *Parratt* and *Hudson,* that because the actions in issue were unauthorized applications of state procedure, it was impossible for the State to provide a predeprivation hearing. *Id.* at 177. The defendants argued that *Parratt* and *Hudson* indicated that no predeprivation hearing was required in their situation because state law provided the Freemans with an adequate postdeprivation remedy. *Id.*

In rejecting the defendant's argument, the Eighth Circuit held that "*Parratt* ... applies only if a determination has been made that a predeprivation hearing is not required." *Id.* (*quoting Littlefield v. City of Afton,* 785 F.2d 596, 600 (8th Cir.1986)). The court concluded that in *Freeman,* a predeprivation hearing was possible. *Id.* In making that determination, the court noted that the decision to suspend the Freemans' license was made by the highest officials in the executive branch of the state government who have final authority over matters for which they are responsible and thus, such acts do not constitute random and unauthorized acts. The court stated that "[t]hese officials knew what actions were going to be taken because they were responsible for making the decisions. Consequently, a predeprivation hearing easily could have been provided." *Id. Freeman* seems to be inconsistent with *Hudson* at first

glance, because in *Hudson* the Court stated that "[w]hether the individual employee himself is able to foresee a deprivation is simply of no consequence. The controlling inquiry is solely whether the state is in a position to provide for predeprivation process." *Hudson,* 468 U.S. at 534, 104 S.Ct. at 3204. Under *Freeman,* the Eighth Circuit reasoned that if the individual official knew what actions were going to take place, then that official could easily provide a predeprivation hearing, and if he does not do so, he is violating a plaintiff's Fourteenth Amendment due process rights.

We believe that *Freeman* and *Hudson* can be read consistently. In *Hudson,* the state employee who deprived the inmate of his constitutional rights was only an officer at the correctional center where the prison inmate was serving his sentence. In *Freeman,* the state employees who suspended the Freemans' license were high ranking state officials: the Assistant Program Director for the Department of Health, the Secretary of the Department of Health, and the Assistant Attorney General. Thus, it is reasonable that "senior-level officials" who know what actions are going to take place, and are able to foresee a deprivation, be responsible for providing predeprivation process.

The Fifth Circuit recently decided a case with similar facts as the one before us. In *Vera v. Tue,* 73 F.3d 604 (5th Cir.1996), a bail bonding company's license to act as surety on bail bonds was suspended by a county sheriff. The owners of the bail bonding company brought a § 1983 claim against the sheriff for violations of their constitutional rights. *Id.* at 606. The court determined that the sheriff's department must provide some process to a bonding company before it could be deprived of its bail bonding license. *Id.* at 609 (citation omitted). In denying the sheriff qualified immunity, the court concluded that "no reasonable official could conclude that suspending Vera's bonding privileges without providing him an opportunity to refute the allegations would not violate Vera's procedural due process rights." *Id.*

Based on the above analysis, this court finds that HBCI should have received a predeprivation hearing. "*Parratt* ... applies

only if a determination has been made that a predeprivation hearing is not required." *Freeman*, 793 F.2d at 177. In this case, Nichols is a senior-level official. He is one of the highest officials in law enforcement in Carroll County. He has the authority to take bail, and in this case, to refuse to take bail. Although he does not have the statutory authority to suspend a license, by refusing to accept all bonds written by a bail bond company, he in effect, suspends its license.

We hold a predeprivation hearing could have easily been provided. When Nichols became aware of HBCI's failure to forfeit bonds in the *Ford* cases, he could have filed a complaint with the Board requesting that they conduct a hearing on the matter. In addition, in applying the balancing approach of *Mathews v. Eldridge*, we find that the likelihood of an erroneous deprivation is great and there is no evidence that a predeprivation hearing would be unduly burdensome. *See Freeman*, 793 F.2d at 177 n. 12. A professional bail bond company license may be essential in the pursuit of a person's livelihood and as such, should not be summarily suspended without notice and a hearing.

█ Nichols contends that even if a violation of § 1983 occurred, he is shielded from liability under qualified immunity. "[P]ublic officials are entitled to qualified immunity when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Grantham v. Trickey*, 21 F.3d 289, 293 (8th Cir.1994) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)).

"Government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738. "The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991) (*quoting, Malley v. Briggs*, 475 U.S. 335, 343, 341, 106 S.Ct. 1092, 1097, 89 L.Ed.2d 271 (1986)). The inquiry is normally one of pure law. *J.H.H. v. O'Hara*, 878 F.2d 240 (8th Cir.1989), *cert. denied*, 493 U.S. 1072, 110 S.Ct. 1117, 107 L.Ed.2d 1024 (1990).

█ The doctrine of qualified immunity shields officials acting only in their individual capacities. *Brandon v. Holt*, 469 U.S. 464, 472–73, 105 S.Ct. 873, 878, 83 L.Ed.2d 878 (1985). Any claims against the defendants in their official capacities may not be defended against on the basis of qualified immunity. *Id.* Nichols argues that he acted reasonably in refusing to accept bonds written by HBCI. We disagree. Qualified immunity shields Nichols from liability unless he violated HBCI's clearly established rights and reasonably should have known he was doing so. This court believes that a reasonable official would have known that Nichols' refusal to accept all bonds written by HBCI, without any notice or hearing, violated the clearly established rights of HBCI.

If Nichols had a complaint against HBCI, he should have filed that complaint with the Board. The law is clear on that issue. Therefore, we find that Nichols is not entitled to qualified immunity.

HBCI originally alleged a pendent state claim for the tort of interference with contractual relations or a business expectancy. However, plaintiff failed to provide any proof to establish its claim. We therefore assume that HBCI is no longer pursuing this claim.

### III. CONCLUSION

Therefore, we conclude that HBCI has proven the essential elements of its § 1983 claim. HBCI has not offered any evidence as to what type and what amount of damages it is entitled to in this case. Therefore, the parties are given until September 26, 1997, to advise the court as to whether they believe a hearing is needed on the matter.